NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case.  A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-840

ADOPTION OF HARPER.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree issued by a judge of the Juvenile Court finding her unfit and terminating her parental rights to her daughter, Harper.[2]  See G. L. c. 119, § 26; G. L. c. 210, § 3.  On appeal, the mother argues that there was insufficient evidence that her parental unfitness was not temporary.  For the reasons herein, we affirm.

Background.  We summarize the judge's factual findings, supplemented where needed by undisputed facts in the record.

The mother began her relationship with Harper's father in 2014.  In 2014, the father moved from Massachusetts to Georgia

_____

[1] A pseudonym.

[2] The father's parental rights were terminated in the same proceeding.  He has not appealed.

to "turn around his life," but upon returning to Massachusetts in 2015, the father began residing with the mother full time.

In 2019, the mother was asked by her employer to take a drug screen after she was seen "nodding off" at her desk. The mother failed this drug screen. The mother retained her employment but was subject to sporadic drug screenings; which, according to the maternal grandmother, the mother either failed or failed to complete. The mother's employment was terminated thereafter.

The mother first became aware of her pregnancy with Harper on April 21, 2022. In June of 2022, at her initial prenatal care appointment, the mother tested positive for marijuana and opiates. At this appointment, the mother agreed to participate in drug screenings going forward, but upon returning for subsequent appointments, the mother refused to participate in the screens because she "knew [she] was most likely going to fail."

In December 2022, Harper was born. At the time of her birth, Harper tested positive for fentanyl. The following day, the Department of Children and Families (department) received a report pursuant to G. L. c. 119, § 51A (51A report), alleging abuse and neglect of Harper by the mother because she exposed Harper to substances like marijuana and fentanyl. As a result of her exposure to fentanyl, Harper experienced withdrawal

2

symptoms which required a longer hospital stay and several morphine treatments.[3]

The department conducted an investigation of the allegations contained in the 51A report, pursuant to G. L. c. 119, § 51B, during which the mother admitted to "taking pills" that she received from a friend to treat generalized pain.  The mother specifically admitted to taking a pill "a few days before giving birth," but said that she did not know that the pill contained fentanyl.  During the investigation, the mother also claimed that she could "stop whenever she wants."  The investigator noted, however, that the mother was "[un]able to clearly state why she was taking the pills she got from the friend."

The department filed a petition in December 2022 alleging that Harper was in need of care and protection, and obtained temporary custody of Harper.  After being released from the hospital, Harper was placed with her maternal grandmother, at the department's recommendation.  Meanwhile, the department developed an interim action plan for the mother and the father.  Pursuant to the action plan, the mother enrolled in a detoxification program on December 24, 2022, but left twenty-six

---

[3] Following her discharge from the hospital, Harper continued to experience withdrawal symptoms for the next three to four months.

3

hours later without obtaining treatment.  The department's social worker then referred the mother to intensive outpatient treatment, which the mother chose to attend virtually rather than in person.

A temporary custody hearing was held on January 24, 2023, during which the mother tested positive for fentanyl and norfentanyl -- a result that the mother denied initially, but later admitted was accurate.  Accordingly, the judge ordered the mother to comply with toxicology screens going forward.  Despite stating that she understood the process by which she was expected to take and submit the court-ordered screenings, the mother did not submit any drug screens for the entire pendency of this case.  The mother reportedly said that she was "scared" to submit to testing but would not elaborate further.  In January 2023, the mother re-entered the detoxification program, and, after leaving the program roughly six days later, maintained to the department that she was "sober" for the entire pendency of this case.

In February of 2023, the mother resumed intensive outpatient treatment, which she completed in April of 2023. During this time, the department remained concerned about the mother's substance use.  This concern stemmed from a home visit in March of 2023, where the mother appeared drowsy, and was seen nodding off.  The department also referred the mother to a

4

program that offered "intensive, trauma-informed combined in-home treatment and case management for DCF involved families impacted by substance use," which was set to begin in March 2023.  The mother failed to appear at a subsequent provider meeting designed to discuss the benefits of the program.  The department kept the program in place, however, and the mother completed the program in June of 2023.

The mother terminated outpatient program services -- which included weekly, virtual counselling sessions with a licensed, independent social worker -- when the social worker left the agency.  At that time, the mother stated that she would not engage in counselling with a new social worker, and she claimed that she was not using substances, a claim that the judge did not credit at trial.  The social worker reported that she could not see any changes in the mother as a result of the sessions, and the mother was not able to verbalize what she had been learning from the outpatient program.  Beyond meeting with a recovery coach, the mother did not engage with any substance abuse treatment from August of 2023 until trial commenced in September of 2024.

During this time, several incidents sustained the department's concerns regarding the mother's substance use.  For instance, on June 2, 2024, at approximately 9 P.M., police officers found the mother asleep behind the wheel of a car that

was parked at a gas pump.  Upon being approached by police, the mother maintained that she had merely parked at the gas pump and fallen asleep.  Furthermore, in or around July 2024, the maternal grandmother went to the mother's apartment for a wellness check, whereupon she found the mother's apartment door unlocked and open, and the mother lying on the couch with her eyes closed.  The maternal grandmother yelled the mother's name repeatedly and the mother did not move.  The maternal grandmother testified that she was frightened by the idea of touching the mother because she thought that the mother might have "taken too much, [and] that she wasn't going to wake up."  The mother woke up after the maternal grandmother touched her a few times.

Additionally, from December of 2022 until the time of trial, the mother visited Harper several times per week, each time under the maternal grandmother's supervision.  Once per month, a department social worker supervised a visit.  Based on the observations of these supervisors, the department had concerns regarding the mother's behavior while attending to Harper.  The mother was once seen entering the maternal grandmother's home upset and "slamming down" her keys and items before approaching Harper.  Moreover, the maternal grandmother reported that the mother was often on her cell phone during visits, appearing "distracted."  The mother also displayed

6

difficulties accepting the boundaries that the maternal grandmother had put in place regarding the frequency of the mother's visits. On one occasion, during an argument with the maternal grandmother, the mother yelled that she would rather Harper be in a foster home than with the maternal grandmother. Furthermore, the maternal grandmother recalled a visit where the mother appeared to be under the influence of drugs, as she had difficulty keeping her eyes open and her speech was slurred and slow.

Trial commenced on September 5, 2024, during which the mother (1) conceded that she was currently unfit to care for Harper, and (2) testified that she had used Oxycodone throughout the pendency of the case, claiming that her "sober date" was August 29, 2024, a week before trial. As noted by the judge, the mother's admission at trial contradicted her prior claims to the department that she had remained sober since her discharge from the detoxification program in February of 2023. The judge entered decrees finding the mother and the father unfit and terminating their parental rights on November 1, 2024. The judge granted the maternal grandmother permanent custody of Harper, approving the plan set forth by the department at trial.

Discussion. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent

7

is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011).  Recognizing that the termination of parental rights is an "extreme step, a judge must decide both whether the parent is currently unfit and whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (quotations and citations omitted). Id.  "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period."  Id. at 60.

"We review the judge's findings with substantial deference, recognizing her discretion to evaluate a witness's credibility and to weigh the evidence," Adoption of Nancy, 443 Mass. 512, 515 (2005), "and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion."  Adoption of Ilona, 459 Mass. at 60.

Here, the mother does not challenge the judge's conclusion that she was unfit at the time of the decree, or that the department made "reasonable efforts" to unify her with Harper -- conclusions for which, in any event, we discern no abuse of discretion or error of law.  Rather, the mother asserts that the judge's conclusion that her unfitness would "continue undiminished into the future with an attendant harmful effect on

8

[Harper]" lacked support by clear and convincing evidence. Specifically, the mother contends that, notwithstanding her history of substance use and unfitness at the time of the decree, the department failed to establish a nexus between her substance use and a risk to Harper in the future. See Adoption of Katharine, 42 Mass. App. Ct. 25, 34 (1997) (explaining that substance misuse disorder, without "a showing that a . . . parent has been neglectful or abusive in the care of that parent's child," does not "translate[] automatically into legal unfitness to act as a parent"). Having carefully reviewed the record, "[w]e see no basis for disturbing the judge's view of the evidence." Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).

Notably, the judge based her conclusion that the mother's unfitness was not temporary, only in part, on the mother's failure to maintain sobriety throughout the pendency of the case. The judge also properly considered the mother's failure to "take[] her substance abuse seriously" in determining that the mother's unfitness was likely to continue indefinitely. Specifically, the judge found that although the mother had engaged in some of the services recommended by the department, she nevertheless (1) "fail[ed] to see the need for certain services, (2) "continue[d] to minimize her history [of substance abuse], and (3) "ha[d] not benefited from the select few

9

services to which she engaged."  See Adoption of Ilona, 459 Mass. at 59-60 ("Even where a parent has participated in programs and services and demonstrated some improvement, we rely on the trial judge to weigh the evidence in order to determine whether there is a sufficient likelihood that the parent's unfitness is temporary").  See also Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019) (parent's failure to benefit from services is "relevant to the determination of unfitness" [citation omitted]).

Given that the mother does not contest that she was unfit at the time of the decree, the judge acted well within her discretion in determining that the mother's unfitness was not temporary where the mother's unwillingness to meaningfully engage in services was abundantly clear from the record.  See Adoption of Luc, 484 Mass. 139, 147 (2020) ("the parent's willingness to engage in treatment is an important consideration in an unfitness determination where the substance dependence inhibits the parent's ability to provide minimally acceptable care of the child").  Furthermore, the judge's finding that the mother was impaired during visits with Harper undermines the mother's claim that there was no foreseeable risk posed by her substance misuse.  Such a finding, coupled with the mother's failure to properly address her drug usage, makes reasonable the judge's conclusion that the mother's unfitness was not temporary

10

and was likely to continue into the foreseeable future.  See Adoption of Ilona, 459 Mass. at 59 ("judge's conclusion that a parent's unfitness is temporary must . . . not [rest] on a 'faint hope'" [citation omitted]); Adoption of Katharine, 42 Mass. App. Ct. at 32-33 ("[Judges] may consider past conduct to predict future ability and performance").

Accordingly, the judge's findings that Harper was in need of care and protection, and decision to commit Harper to the permanent custody of the maternal grandmother, were sound.  The decree terminating the mother's parental rights and dispensing with the need for her consent to Harper's adoption is affirmed.

So ordered.

By the Court (Vuono, Henry & Singh, JJ.[4]),

Clerk

Entered:  July 9, 2026.

---

[4] The panelists are listed in order of seniority.

11